## CONTINENTAL BANK & TRUST CO. OF NEW YORK v. UNITED STATES.

District Court, S. D. New York.
April 9, 1937.

16

Friedman & Friedman and Bernhard Knollenberg, all of New York City (Hyman R. Friedman, Lord, Day & Lord, and Harry J. Rudnick, all of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City, for the Southern District of New York (Malcolm A. Crusius, Asst. U. S. Atty., of New York City, of counsel), for defendant.

CLANCY, District Judge.

This is an action against the United States based upon refund claims to recover taxes paid for the fiscal year ending May 31, 1929. There are two causes of action. In the first cause of action the plaintiff seeks to recover $54,962.37 and interest upon the ground that its income was improperly taxed as that of an association, whereas it should have been taxed as income of a trust. In the second cause of action plaintiff seeks the recovery of $8,-279.63 and interest because of an alleged overpayment of income tax for the same fiscal year. The two causes of action will be considered separately.

First Cause of Action.

The amount of tax demanded and collected from the plaintiff was that set forth in section 13 of the Revenue Act of 1928 (26 U.S.C.A. § 13 and note), which fixes the rate of income tax for corporations. The term "corporation" is defined in section 701 (a) (2) of that act, 26 U.S.C.A. § 1696 (3), as follows: "The term 'corporation' includes associations, joint-stock companies, and insurance companies." See Treasury Regulation 74, Articles 1312 and 1314. The plaintiff claims that the tax should have been levied under section 161 of the act (26 U.S.C.A. § 161 and note) which fixes the rate of tax on "the income of estates or of any kind of property held in trust."

The plaintiff is the sole successor trustee of a so-called investment trust now known as "United New York Bank Trust Shares," under the terms of an agreement and declaration of trust, dated February 27, 1928, originally entered into by Empire Trust Company (known as the trustee) with United States Shares Corporation (known as the corporation) and the holders or bearers from time to time of certificates for Trust Shares to be issued under the declaration of trust. This trust indenture contemplates the deposit by the corporation with the trustee of 1 share of the stock of each of 20 designated banks and trust companies to be held as a unit for the benefit of the certificate holders, and for the subsequent deposit of additional units of the stocks of the same banks and trust companies. The indenture also provides for the creation of a reserve fund in which each unit of stocks shall have an equal undivided interest. This reserve fund is made up of the following: (1) So much of the net proceeds of the sale of stocks in the units as shall be in excess of the average cost of the acquisition of such stocks, (2) such amount of cash, accompanying a subsequent deposit of each additional unit, as will equal the value of the interest of each of the original units in the then existing reserve fund, and (3) interest received on cash balances in the reserve fund.

The beneficial interest of the participants in the trust is evidenced by a certificate for 1,000 Trust Shares (or a fractional part thereof) issued against each unit of stocks. These certificates are of two kinds, coupon certificates, which are transferable by delivery, and registered certificates, which are transferable only on

the books of the trustee. One form of certificate may be changed into the other upon request of the holder. Paragraph 54 of the indenture provides that "The Corporation shall be entitled to retain for its own use and that of its associates its profits upon the purchase or sale of Certificates for Trust Shares and/or other securities, and for its own use any benefit accruing to it under this Agreement." The compensation of the managing corporation is fixed at one-tenth of 1 per cent. of the value of the principal of the units and the reserve fund. The trustee is not limited to statutory commissions, but his compensation is fixed in the indenture on the basis of the units held, number of certificate holders, and dividends received and disbursed, etc.

The trust is to automatically terminate on January 1, 1949, unless sooner terminated by the number of Trust Shares outstanding aggregating less than 10,000, subject to the right, as to consenting certificate holders, to postpone said expiration date for not more than two periods of not exceeding five years each. Before the expiration of the trust, a holder or bearer of a certificate representing in the aggregate 1,000 Trust Shares, upon surrender of his certificate, is entitled to receive the cash sum and the underlying stock certificates included in one unit and the cash sum equivalent to the value of the interest of one unit in the reserve fund. After the termination of the trust, the holder or bearer is entitled to receive a pro rata share of the liquidated proceeds of the property of the trust. By an ancillary agreement between the managing corporation and the trustee, the latter agreed to purchase for cash, to be supplied by the managing corporation, any certificates for less than 1,000 shares presented to it.

Article VI, paragraph 23, of the indenture contains the following provision in regard to the sale of the designated bank stocks and reinvestment of the proceeds:

"If at any time any Company, any of whose stock is included in a unit held by the trustee hereunder shall liquidate voluntarily or otherwise, or if a receiver be appointed for a substantial portion of its property and such receivership shall continue for sixty (60) days without any Court proceeding instituted for the discharge of said receiver, or shall fail for one year to pay any dividend on such stock, or if at any time the corporation should reach the conclusion that dividends will cease either temporarily or permanently to be paid in cash on its stock by any such Company or that the then market value of such stock will become impaired; then and in any such event the corporation shall have the right, but not the obligation, in accordance with its sole discretion and judgment to sell such stock and the proceeds of such sale to an amount not exceeding the average cost of acquisition of such stock by the corporation or by the trustee, as the case may be, shall be held in equal portions in the units for reinvestment as herein provided in the stock of banks and/or trust companies organized under the laws of the United States or of any of the States thereof, and the excess, if any, of such proceeds over such average cost of acquisition shall be paid by the trustee into the principal of the Reserve Fund as provided herein. The following conditions shall govern all reinvestments of cash funds in the units: They shall be such that (1) not more than ten (10%) per cent. of the total investment in the unit shall by reason of such reinvestment be at the date thereof in the stock of any one company, except in the case of a company showing a surplus and undivided profits in excess of five times its capital; (2) no stock shall be placed in the unit as a reinvestment unless it shall have paid a dividend within one (1) year prior to inclusion in the unit; (3) no stock of a company shall be placed in the unit as a reinvestment unless at the date thereof such company shall have capital of at least one million ($1,000,000) dollars and surplus and undivided profits of at least fifty (50%) per cent. of its capital, and deposits of at least twenty million ($20,000,000) dollars and shall have realized earnings for the fiscal year last preceding its inclusion in the unit in an amount at least ten (10%) per cent. in excess of its dividend disbursements during such year."

Provision is made for investment of cash in the reserve fund on order of the managing corporation as and when in its unrestricted discretion the same shall seem desirable in the interest of holders of Trust Shares, upon conditions set forth above in subdivisions (2) and (3), and the managing corporation is given the right, in its own unrestricted discretion, to direct the trustee to sell in the open market at the best obtainable price any or all of the property in the reserve fund.

Stock dividends and any securities or other distributions by way of liquidation, dissolution, or merger of the banks whose stocks compose the units are to be sold to the reserve fund, otherwise to the managing corporation, and if not purchased by the latter, on the open market at the best price obtainable. The proceeds are to be reinvested in the same manner as that portion of the proceeds of the sale of stocks in the units not in excess of the cost of acquisition.

Distribution of income and profits of the trust is to be made semiannually on June 1st and December 1st of each year, in the form of dividends consisting, after payment of compensation and expenses, of the cash dividends and cash proceeds of the sale of stock rights or other distributions in the form of dividends as defined in the indenture, received by the trust in respect of the stock in the units, interest upon the cash principal of the units and such sums, if any, as shall be transferred from the reserve fund to the income account of the units in accordance with the provisions in the indenture. These latter sums to be transferred from the reserve fund are to include 50 per cent. of the net proceeds from the sale of stocks in the units in excess of the cost of acquisition of such stocks and such an amount as is necessary to enable the trustee to distribute to the holders of Trust Shares total dividends at the rate of 5 per cent. per annum on the managing corporation's asked price for said Trust Shares at the close of business on the preceding June 1st or December 1st.

There are in the indenture other provisions not pertinent to this decision.

The corporation return discloses that for the fiscal year in question the plaintiff's predecessor reported a gross income of $1,072,077.26 and a net income of $1,010,035.18. The gross income was made up of the following items: Profit from sale of stock, $905,201.54; proceeds from sale of stock rights, $104,882; dividends, $47,770.63; interest on bank balances, $14,223.09.

In Morrissey v. Commissioner, 296 U.S. 344, at page 356, 56 S.Ct. 289, 295, 80 L.Ed. 263, Chief Justice Hughes defined an association within the meaning of the taxing act as follows:

" 'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. Such beneficiaries do not ordinarily, and as mere cestuis que trustent, plan a common effort or enter into a combination for the conduct of a business enterprise. Undoubtedly the terms of an association may make the taking or acquiring of shares or interests sufficient to constitute participation, and may leave the management, or even control of the enterprise, to designated persons. But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, the development of tracts of land, the construction of improvements, and the purchase, management, and sale of properties; or for dealings in securities or other personal property; or for the production, or manufacture, and sale of commodities; or for commerce, or other sorts of business; where those who become beneficially interested, either by joining in the plan at the outset, or by later participation according to the terms of the arrangement, seek to share the advantages of a union of their interests in the common enterprise."

In my opinion the trust in question qualifies as an association under this definitive description. It has "the distinctive feature of being created to enable the participants to carry on a business and divide the gains" so as to be "sufficiently analogous to corporate organization to justify the conclusion that Congress intended that the income of the enterprise should be taxed in the same manner as that of corporations." Morrissey v. Commissioner, supra, 296 U.S. 344, at page 360, 56 S.Ct. 289, 296, 80 L.Ed. 263. The principal argument upon which the plaintiff bases its contention that it is not a business trust, but rather a strict trust, is that the indenture contemplates the creation of a "supervised unit series" type of investment

trust, to use the plaintiff's term, as distinguished from the so-called "fund" type of investment trust. The plaintiff describes another type of investment trust known as the "fixed" type in which the trustee's power of investment is limited to a more restricted number of securities. The plaintiff claims that under this "supervised unit series" type of investment trust the trustee's power of investment is limited somewhat in the same manner as is the ordinary fiduciary and that accordingly the trustee is not permitted to speculate. But the investment of trust funds may constitute the doing of business. Brooklyn Trust Co. v. Commissioner (C.C.A.) 80 F.(2d) 865; Investment Trust of Mutual Investment Company v. Commissioner, 27 B.T.A. 1322, affirmed in (C.C.A.) 71 F.(2d) 1009. This investment trust was not organized to merely "hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains." Morrissey v. Commissioner, supra. The twenty-nine sales of securities, which the income tax return sets forth as resulting in the profit constituting almost 85 per cent. of the gross income of the trust for the fiscal year in question, sufficiently evidenced a degree of activity in management that distinguishes the enterprise as a business trust. Ittleson v. Anderson (C.C.A.) 67 F.(2d) 323; Brooklyn Trust Co. v. Commissioner, supra.

The plaintiff advances the additional argument that the power of sale granted to the managing corporation, as set forth above, only permits a sale to avoid a loss and that this is a grant of only so much power as a trustee of a true trust should and must possess. By the terms of the indenture the managing corporation is empowered to sell in its sole discretion and judgment whenever it should reach the conclusion that the then market value of the stock will become impaired. Under this broad power the managing corporation could sell at a profit, as it did, securities which it had purchased at a lower figure and under the terms of the indenture 50 per cent. of this profit goes to the participants in the trust. I, accordingly, hold that this trust was properly taxed as an association.

### Second Cause of Action.

In the second cause of action, the plaintiff seeks to recover $8,279.63, representing as the plaintiff claims, an overpayment of income tax for the fiscal year ending May 31, 1929. All the facts in relation to this second cause of action were stipulated between the parties. The net income for the fiscal year in question reported by plaintiff's predecessors, included the sum of $84,802.16, the entire proceeds of the sale of certain rights to subscribe to additional capital stock of banks and trust companies whose shares were owned by the trust. A claim for refund of part of the tax paid was made on the ground that the net income of the trust was overstated by not less than $71,569.43, representing that part of the proceeds of the sale of the rights referred to above, which consisted of a return of capital. The claim was rejected.

The Revenue Act of 1928 (45 Stat. 791), which is applicable here, contains no specific provisions relating to stock rights. The relevant capital gains provisions are contained in sections 111 (a) and 113 (a), 26 U.S.C.A. §§ 111, 113 notes. However, Article 58 of Treasury Regulations 74, promulgated under the Revenue Act of 1928, provides in part as follows:

"* * * Where a corporation issues to its shareholders rights to subscribe to its stock, the value of the rights does not constitute taxable income to the shareholder, although gain may be derived or loss sustained by the shareholder from the sale of such rights. In this connection the following rules may be stated:

"(1) If the shareholder does not exercise, but sells his rights to subscribe, the cost or other basis of the stock in respect of which the rights are issued shall be apportioned between the rights and the stock in proportion to the respective values thereof at the time the rights are issued, and the basis for determining gain or loss from the sale of a right on one hand or a share of stock on the other will be the quotient of the cost or other basis assigned to the rights or the stock, divided, as the case may be, by the number of rights issued or by the number of shares held.

"* * * The taxpayer may at his option include the entire proceeds from the sale of stock rights in gross income, in which case the basis for determining gain or loss from the subsequent sale of the stock in respect of which the rights were issued shall be the same as though the rights had not been issued."

The government contends that the election of the plaintiff's predecessor to include the entire proceeds from the sale of the subscription rights in gross income is binding upon the plaintiff and that the plaintiff is estopped from apportioning the cost of the stock between the rights and the stock in proportion to their respective values at the time the rights were issued. This apportionment is the basis of the plaintiff's claim that only part of the proceeds of the sale is taxable as income. It is here noted that, although the entire proceeds of the sale of the rights were reported as income for the fiscal year in question, in its returns for subsequent years, when the stocks were sold, the trustee adjusted the cost basis of such stocks and reduced such cost by that portion of the cost which it had then apportioned to the rights and which it had previously reported as income in accordance with one of the methods permitted in the Regulations.

■■ In Miles v. Safe Deposit & Trust Company, 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923, the Supreme Court held that a right to subscribe to additional corporate stock is analogous to a stock dividend and, relying upon Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570, decided that such a stock subscription right of itself did not constitute gain, profit, or income taxable under the Sixteenth Amendment, but that only so much of the proceeds of the right as represented, upon its sale, a realized profit over the cost to the stockholder of what was sold constituted taxable income. Sections 111 (a) and 113 (a) of the 1928 Revenue Act, 26 U.S.C.A. §§ 111, 113 notes, provide that the gain from the sale of property shall be the excess of the amount realized over the cost of the property. Therefore, that portion of Article 58 of the Regulations which grants to the taxpayer the option to include as income that which is not income would appear to be invalid since it exceeds and is inconsistent with the law. Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756; Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528; Hewitt Realty Co. v. Commissioner (C.C.A.) 76 F.(2d) 880, 98 A.L.R. 1201; Boca Ratone Co. v. Commissioner (C.C.A.) 86 F.(2d) 9.

■ It follows from this that the plaintiff is not bound by the determination of its predecessor to report the entire proceeds of the sale as income. There are no elements of estoppel in the case and no amount of administrative expediency or convenience would justify precluding the plaintiff from asserting an overpayment.

Counsel for the government calls to my attention a memorandum of the General Counsel of the Bureau of Internal Revenue reciting that in his opinion the option, provided for in the Regulations, once exercised, is irrevocable. G.C.M. 10170, C.B. XI-1 p. 15 (1932). This memorandum assumes the validity of the regulation and relies on Le Bolt & Co. v. United States, 67 Ct. Cl. 422, and Grant v. Rose (D.C.) 24 F. (2d) 115, affirmed in (C.C.A.) 39 F.(2d) 340. Both of these cases held in effect that where there are two legal methods of reporting income the taxpayer is bound by his election to make his return in accordance with one of these methods. In the case at bar, the taxpayer reported as income that which was not income. Under the statute, there was only one legal method of reporting the profit on the sale of the stock subscription rights and the method adopted by plaintiff's predecessor was improper. Plaintiff cannot be bound by any such claimed election. Jones v. Commissioner, 31 B.T.A. 55, petition for review denied in (C.C.A.) 82 F.(2d) 329; Key Largo Shores Properties, Inc., v. Commissioner, 21 B.T.A. 1008; Tide Water Oil Co. v. Commissioner, 29 B.T.A. 1208; United Profit-Sharing Corp. v. United States, 66 Ct.Cl. 171; Richmond Hosiery Mills v. Rose (C.C.A.) 73 F.(2d) 315.

It is conceded by counsel for the plaintiff that the government is entitled to offset the sum of $3,202.60 against any recovery herein. Accordingly, judgment will be entered in favor of the plaintiff in the sum of $5,077.03, with interest from May 15, 1930.